# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BERKLEY SPECIALTY
INSURANCE COMPANY,

    Plaintiff-Counterclaim
    Defendant,

v.

MASTERFORCE CONSTRUCTION
CORP., *et al.*,

    Defendants-Counterclaim
    Plaintiff,

No. 4:19-CV-01162

(Judge Brann)

## MEMORANDUM OPINION

### JANUARY 26, 2021

## I.  BACKGROUND

Berkley Specialty Insurance Company ("Berkley") filed this complaint seeking declaratory judgment that it owes no duty to indemnify Masterforce Construction Corp. ("Masterforce") or any other Defendants for a judgment rendered in favor of John P. Brandt and Karen Brandt (collectively "Brandts") in an underlying state action.[1] Defendants filed their answers[2] and Masterforce simultaneously filed a counterclaim seeking declaratory judgment that Berkley

---

[1]  Doc. 1.
[2]  Docs. 7, 8.

breached its duty to indemnify Masterforce and acted in bad faith in refusing to indemnify Masterforce.[3]

This action arises from a failed roof installation and subsequent civil suit in Pennsylvania state court. In 2012, the Brandts contracted with Masterforce to install a new standing seam metal roof on the Brandts' home at a cost of $42,450.[4] Masterforce—although purporting to be the contractor that would install the roof—never intended to install the roof itself.[5] Rather Masterforce intended to, and in fact did, hire a subcontractor to install the roof—in this case, Keith Wilton.[6] Wilton was instructed by Masterforce to conceal his identity as a subcontractor and to instead hold himself out as an employee of Masterforce.[7]

During construction, Wilton failed to cover the roof, resulting in a substantial leak due to rain; the Brandts paid $481 to repair damage resulting from that leak.[8] After the roof was completed, a leak occurred on January 11, 2013; although Masterforce was contractually obligated to repair the roof, it informed the Brandts that they needed instead to contact Wilton.[9] Wilton later informed the Brandts that he had been to the property and had applied caulk to the roof, which he asserted

---

[3]   Doc. 7 at 12-16.
[4]   Doc. 1-3 at 5-6.
[5]   *Id.* at 11.
[6]   *Id.* at 6-7.
[7]   *Id.* at 7.
[8]   *Id.*
[9]   *Id.*

would fix the leak.[10] Additional leaks occurred on January 29, 2013 and January 30, 2014—after the 2014 leak, the Brandts ceased dealing with Masterforce or Wilton.[11] In April 2014, the Brandts paid Marcon Roofing $2,782 to inspect the roof and replace the ridge vent, which had not been properly installed and which contributed to the leaks.[12] The Brandts thereafter filed suit in state court; while that suit was pending, the roof again leaked in January 2018, and the Brandts ultimately needed to replace the entire roof at a cost of $67,020, plus an additional $5,000 to design the new roof.[13] These costs were necessary because it was determined that the roof that Masterforce installed should never have been installed on the Brandts' home, as the home's slope was less than three inches per foot.[14]

During the proceedings in state court, Berkley agreed to defend Masterforce pursuant to two insurance policies but reserved its rights to deny coverage or withdraw from defending Masterforce.[15] Those policies, entered into in 2012 and 2013,[16] provided commercial general liability insurance and, thus, provided certain coverage subject to limits of $1,000,000 for each occurrence and $2,000,000 in the aggregate, along with $2,000,000 products-completed operations aggregate.[17]

---

[10]   *Id.* at 8.

[11]   *Id.* at 7-8.

[12]   *Id.* at 9.

[13]   *Id.*

[14]   Doc. 1-3 at 9; Doc. 30-6 at 7.

[15]   *See* Doc. 1-7.

[16]   Policy number CGL 0016734-24 was active from May 18, 2012 to May 18, 2013 (the "2012 Policy"). (Doc. 1-1 at 5). Policy number CGL 0016734-25 was effective from May 18, 2013 to May 18, 2014 (the "2013 Policy"). (Doc. 1-2 at 4).

[17]   Doc. 1-1 at 16; Doc. 1-2 at 15.

Both policies provided limitations to coverage. Those policies state that Berkley would cover "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage'" that is "caused by an 'occurrence.'"[18] The policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions" and define "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property" or the "[l]oss of use of tangible property that is not physically injured."[19]

After a two-day bench trial, the state court found in favor of the Brandts.[20] The court determined that the roof was improperly installed and never should have been installed on the Brandts' home, as the slope of the roof was less than four inches per foot, which violated zoning regulations and manufacturer recommendations.[21] The court also concluded that Masterforce, Wilton, and others "acted in concert and conspired to deceive and defraud Plaintiffs by intentional actions and inactions which included the purposeful manipulation of the many Defendants to obscure who was the actual party to the contract, the actual party doing the work and the actual party responsible for the warranty."[22]

---

[18]   Doc. 1-1 at 30; Doc. 1-2 at 29.
[19]   Doc. 1-1 at 45-46; Doc. 1-2 at 42-43.
[20]   Doc. 1-3 at 9.
[21]   *Id.*; *see* Doc. 30-6 at 7 n.12.
[22]   Doc. 1-3 at 9-10.

The state court further determined that Masterforce violated the Pennsylvania Home Improvement Consumer Protection Act (HICPA) and Unfair Trade Practices and Consumer Protection Law (UTPCPL) by failing to register as contractors, failing to disclose that the roof installation was being performed by a subcontractor, charging the Brandts for work agreed upon in the contract, and abandoning its duty under the contractual warranty covering the roof.[23] The court found the Brandts' total damages to be $74,216.05.[24] However, because Masterforce "intentionally conspired to deceive" the Brandts, the court determined that the Brandts were entitled to treble damages under the UTPCPL and HICPA.[25] The state court further awarded attorneys' fees in the sum of $195,159.20,[26] for a total award of $492,023.40.

Berkley and Masterforce have now filed competing motions for judgment on the pleadings.[27] Berkley asserts that it is entitled to judgment in its favor as, for five reasons, it owed no duty to indemnify Masterforce.[28] First, Berkley contends that Masterforce's conduct does not qualify as an accident sufficient to trigger coverage, as the damage to the Brandts' roof was caused by defective construction.[29] Second, Berkley argues that there is no coverage for Masterforce's intentional conduct, and

---

[23] *Id.* at 10-13.
[24] *Id.* at 13-15.
[25] *Id.* at 17; *see id.* at 15-18.
[26] Doc. 30-6 at 11.
[27] Docs. 30, 34.
[28] Doc. 31.
[29] *Id.* at 16-19.

all treble damages arose from Masterforce's intentional deception of the Brandts.[30]

Third, Berkley asserts that there is no coverage for a breach of contract or warranty.[31]

Fourth, Berkley argues that attorneys' fees are not covered by the policies.[32] Finally,

Berkley contends that treble damages are not covered for the further reason that

treble damages are akin to punitive damages, which are excluded from coverage both

by the terms of the policies, and as a matter of public policy.[33]

Defendants in turn argue that they are entitled to judgment on the pleadings

and an order directing that Berkley indemnify Masterforce for the state court

judgment.[34] Defendants first argue that Berkley should be estopped from disclaiming

coverage under the 2013 Policy because, in its reservation of rights letter, Berkley

only referenced the 2012 Policy and, thus, failed to reserve its rights under the 2013

Policy.[35] Second, Defendants assert that Berkley's arguments against

indemnification are incorrect, and the damages in the underlying state case arose

from property damage caused by an occurrence, meaning that those damages are

covered by the insurance policies.[36]

---

[30] *Id.* at 20-21.

[31] *Id.* at 22-23.

[32] *Id.* at 23-24.

[33] *Id.* at 25-27.

[34] Doc. 35; *see* Doc. 33. Defendants have joined the Brandts' response in all respects with the exception of the argument that Berkley should be estopped from disclaiming coverage under the 2013 Policy. (Doc. 33). For the sake of simplicity, the Court will refer to all arguments as being made by Defendants collectively.

[35] Doc. 35 at 12-16.

[36] *Id.* at 17-24.

Briefing is complete, and these motions are now ripe for disposition.[37] For the following reasons, Berkley's motion for judgment on the pleadings will be granted and judgment entered in its favor, while Defendants' motion for judgment on the pleadings will be denied.

## II.   DISCUSSION

"A motion for judgment on the pleadings under Rule 12(c) is analyzed under the same standards that apply to a Rule 12(b)(6) motion."[38] Accordingly,

> the court must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party, and may not grant the motion unless the movant clearly establishes that no material issue of fact remains to be resolved and that [it] is entitled to judgment as a matter of law.[39]

"Thus, in deciding a motion for judgment on the pleadings, a court may only consider the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."[40]

### A.   Whether Berkley is Estopped from Disclaiming Coverage

The Court first considers whether Berkley should be estopped from disclaiming coverage based upon its failure to file a reservation of rights letter with respect to the 2013 Policy. Although it is undisputed that Berkley reserved its rights

---

[37]   *See* Docs. 32, 35, 37, 38, 39.
[38]   *Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019) (internal quotation marks omitted).
[39]   *Id.* (internal quotation marks omitted).
[40]   *Id.* (internal quotation marks omitted).

to deny coverage with respect to the 2012 Policy,[41] Defendants assert that Berkley never reserved its rights with respect to the 2013 Policy and, since that policy also covers the relevant period during which the events underlying the state court judgment occurred, Berkley cannot disclaim coverage of the damages arising from that suit.[42]

It is clear from the reservation of rights letter attached to the complaint that Berkley only reserved its rights under the 2012 Policy.[43] Nevertheless, the Court agrees with Berkley that estoppel does not apply for three primary reasons.

First, the Court finds that the 2013 Policy is not implicated here and, rather, the 2012 Policy is dispositive. Both insurance policies provide that they cover only damage that "occurs during the policy period."[44] In Pennsylvania, "courts have generally applied one of five theories for determining which event triggers coverage under a policy of third party liability insurance."[45]

> These theories include: wrongful act (coverage triggered when wrongful act is committed); exposure (coverage triggered when injured person or damaged property is first exposed to harm); first manifestation (coverage triggered when harm is first manifested);

---

[41] Masterforce now asserts that "there is a question as to whether the 2015 Letter was ever sent to or received by Masterforce." (Doc. 32-1 at 15). This directly contradicts its answer to the complaint, wherein it acknowledged that Berkley defended Masterforce pursuant to a reservation of rights. (*See* Doc. 1 ¶5 (noting that "Berkley defended Masterforce in the Underlying Action, pursuant to a reservation of rights"); Doc. 7 ¶5 (Masterforce admits allegations in the complaint at paragraph five with no exception)). Accordingly, the Court affords no weight to Masterforce's statements to the contrary—statements that are made for the first time in a response brief.

[42] Doc. 32-1 at 14-16.

[43] *See* Doc. 1-7.

[44] Doc. 1-1 at 30; Doc. 1-2 at 29.

[45] *Pa. Nat. Mut. Cas. Ins. Co. v. St. John*, 106 A.3d 1, 14 (Pa. 2014).

continuous or multiple trigger (coverage triggered under every policy between time of exposure until manifestation of harm); and injury in fact (coverage triggered when claimant suffers injury).[46]

Although, as a general matter, determining "the appropriate trigger of coverage under a policy of insurance turns upon the language of the respective policy, and requires a careful investigation of the factual circumstances comprising the claim," here such an undertaking is not required as, under any theory, the triggering event occurred during the existence of the 2012 Policy.[47]

The first water leak occurred on September 19, 2012; although this leak caused damage to the Brandts' home, the leak was caused by Wilton's failure to cover the roof during construction, not by improper construction of the roof.[48] However, the second and third leaks, which occurred on January 11, 2013, and January 29, 2013, occurred after the roof was fully constructed and were undoubtedly the result of defective construction.[49] Thus, under the "wrongful act" triggering theory, the triggering event occurred when the roof was improper constructed in late 2012, within the effective date of the 2012 Policy.

Under the "exposure" theory, the triggering event occurred—at the latest—on January 11, 2013, when leaks on the fully-constructed roof "first exposed [the

---

[46] *Id.*

[47] The Court notes, however, that the Supreme Court of Pennsylvania considered nearly identical insurance policy triggering language *St. John* and determined that "consistent with the first manifestation approach, only the policy in effect when an occurrence first arises is answerable for the ensuing bodily injury or property damage." 106 A.3d at 34.

[48] Doc. 1-3 at 7.

[49] *Id.*

damaged property] to harm."[50] Similarly, under both the "first manifestation" and "multiple trigger" theories, harm first manifested in January 2013 with the first leak that was caused by the improperly-constructed roof, as "property damage bec[ame] reasonably apparent" at that time.[51] Finally, the Brandts suffered injury in fact in 2012 when the defective roof was installed. Consequently, under any triggering theory, coverage was triggered during the existence of the 2012 Policy and prior to the 2013 Policy's effective date of May 18, 2013—Berkley was therefore required to reserve its rights only under the 2012 Policy.

Second, even if coverage were available under the 2013 Policy, there is no evidence in the pleadings or other relevant documents that demonstrates Berkley intentionally waived its ability to deny coverage under the 2013 Policy. As the Superior Court of Pennsylvania has noted, "[t]he rule is well established that conditions going to the coverage or scope of a policy of insurance may not be waived by implication from the conduct or action of the insurer."[52] Here, Defendants argue that Berkley implicitly waived its rights to deny coverage, which cannot form the basis of a valid waiver under Pennsylvania law.

Of equal importance, the Superior Court has held that "[t]he doctrine of implied waiver is not available to bring within the coverage of an insurance policy,

---

[50]   *St. John*, 106 A.3d at 14.
[51]   *Id.* at 28.
[52]   *Gemini Ins. Co. v. Meyer Jabara Hotels LLC*, 231 A.3d 839, 851 (Pa. Super. Ct. 2020) (ellipsis omitted).

risks that are expressly excluded therefrom. In Pennsylvania, the doctrine of waiver or estoppel cannot create coverage where none existed."[53] Thus, the doctrine of estoppel may not be used to affirmatively expand coverage under the insurance policies where none existed which, as discussed below, is the case here.

Third, the Brandts cannot assert estoppel, as they did not affirmatively assert that defense in their answer,[54] as required by Federal Rule of Civil Procedure 8(c)(1).[55] As the United States Court of Appeals for the Third Circuit has explained, "[a]n affirmative defense that is neither pleaded as required by Rule 8(c) nor made the subject of an appropriate motion under Rule 12(b) is waived."[56] Because Defendants failed to assert the defense of estoppel in their answer, and such a defense is not appropriately raised in a Rule 12(b) motion, Defendants have waived any ability to assert that Berkley is estopped from disclaiming coverage.

### B. Whether Damages are Covered Under the Insurance Policies

Turning next to the question of whether the damages are covered under the 2012 Policy, Defendants first assert that the damages resulted from an occurrence, as the faulty workmanship damaged third-party property.[57] Moreover, Defendants contend that the damages are covered by the insurance policies because Defendants

---

[53] *Id.* (brackets omitted).
[54] *See* Doc. 8 at 25-29.
[55] *See* Fed. R. Civ. P. 8(c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense").
[56] *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 216 (3d Cir. 2017) (brackets and internal quotation marks omitted).
[57] Doc. 32-1 at 17-20.

did not intend any property damage, attorneys' fees are covered under the policies, and treble damages are not excluded under the policies.[58]

Under Pennsylvania law "[a] court's first step in a declaratory judgment action concerning insurance coverage is to determine the scope of the policy's coverage."[59] "After determining the scope of coverage, the court must examine the complaint in the underlying action to ascertain if it triggers coverage" that would require the insurer "to defend until such time that the claim is confined to a recovery that the policy does not cover."[60] An insurer's duty to indemnify is triggered only "in the event the insured is held liable for a claim covered by the policy."[61]

As discussed above, the 2012 Policy covers bodily injury or property damage that is caused by an "occurrence."[62] An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[63] Thus, the key question is whether the damages arose from an accident.

In interpreting the word "accident," the Supreme Court of Pennsylvania in *Kvaerner* "h[e]ld that the definition of 'accident' required to establish an 'occurrence' under the policies cannot be satisfied by claims based upon faulty

---

[58] *Id.* at 20-24.
[59] *Gen. Acc. Ins. Co. of Am. v. Allen*, 692 A.2d 1089, 1095 (Pa. 1997).
[60] *Id.*
[61] *Id.*
[62] Doc. 1-1 at 30; Doc. 1-2 at 29.
[63] Doc. 1-1 at 45-46; Doc. 1-2 at 42-43.

workmanship."[64] This is so because "[s]uch claims simply do not present the degree of fortuity contemplated by the ordinary definition of 'accident' or its common judicial construction in this context. To hold otherwise would be to convert a policy for insurance into a performance bond."[65] Thus, in instances where property damages result "from poor workmanship," such damage is not covered by the relevant insurance policy, and the insurer has "no duty to defend or indemnify" the insured.[66]

Despite this holding, there remains an open question whether, under Pennsylvania law, an "accident" occurs when the underlying claims are based upon faulty workmanship when the faulty workmanship results in damage to third-party property—i.e., property that belongs to someone other than the insured. The Superior Court of Pennsylvania has concluded that "where the underlying claims allege that the insured's faulty work caused personal injury or an event that damaged other property, . . . there [i]s an 'occurrence' and . . . the insurer ha[s] a duty to defend."[67]

The Superior Court has reasoned that damage to thirty-party property caused by faulty workmanship is covered under insurance policies for two reasons. First, in

---

[64] *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Com. Union Ins. Co.*, 908 A.2d 888, 899 (Pa. 2006).

[65] *Id.*

[66] *Id.* at 900.

[67] *Pa. Mfr. Indem. Co. v. Pottstown Indus. Complex LP*, 215 A.3d 1010, 1016 (Pa. Super. Ct. 2019) (citing *Indalex Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 83 A.3d 418, 425-26 (Pa. Super. Ct. 2013)).

*Indalex*, the Superior Court quoted a footnote from *Kvaerner* wherein the Supreme Court of Pennsylvania noted a law review article "aptly explained" the reasons why an accident cannot be based upon faulty workmanship.[68] The *Indalex* court focused on language in that footnote that stated, in part, "[t]he coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained."[69]

Second, the Superior Court explained in a later decision that damage to thirty-party property caused by faulty workmanship should be covered because such a holding

> is consistent with the rationale of *Kvaerner* that the term "occurrence" must not be interpreted so broadly that it converts the policy into a performance bond, as this construction does not provide coverage for loss of the value of the insured's performance. Rather, it construes the policy as providing insurance for a risk that [insurance] policies are intended to cover, damage that the insured causes to another person's property.[70]

Despite the caselaw that has emerged from the Superior Court, the Court notes that it is not bound by these decisions. As the Third Circuit has explained, although courts should "give due deference to the decisions of intermediate state courts . . . [s]tate appellate decisions . . . are not controlling."[71] Thus, "while [courts] may not

---

[68]  *Indalex*, 83 A.3d at 422-23 (quoting *Kvaerner*, 908 A.2d at 899 n.10).
[69]  *Id.* (emphasis omitted).
[70]  *Pottstown*, 215 A.3d at 1017.
[71]  *In re Makowka*, 754 F.3d 143, 148 (3d Cir. 2014).

ignore the decision of an intermediate appellate court, [they] are free to reach a contrary result if, by analyzing other persuasive data, [they] predict that the State Supreme Court would hold otherwise."[72]

Here, the Court is not persuaded by the reasoning of the Superior Court and instead concludes—in accordance with an earlier well-reasoned opinion from the Third Circuit—that the Supreme Court of Pennsylvania would determine that damage to third-party property caused by faulty workmanship does not qualify as an accident sufficient to trigger insurance coverage.

In *Specialty Surfaces International, Inc. v. Continental Casualty Co.*, the Third Circuit examined whether damages awarded in state court litigation were caused by an "occurrence" such that they were covered by the relevant insurance policy.[73] There, a construction company was hired for a "project involving the construction and installation of synthetic turf football fields and all weather tracks at four District schools."[74] Within one year of the installation of those fields, the fields "began to exhibit defects in materials and workmanship," which included "failures of the subdrain system under the synthetic turf, including splits in the subsurface impermeable membrane and inadequate sealing thereof."[75] As a result of those failures, water "leaked from the subdrain system into the subgrade, dirt . . . washed

---

[72] *Id.* (internal quotation marks omitted).
[73] 609 F.3d 223, 237-39 (3d Cir. 2010).
[74] *Id.* at 227.
[75] *Id.* at 228.

from the subgrade into the subdrain system, the subgrade . . . settled and the soil stabilizer . . . remulsified . . . [which led to] depressions and unstable playing surfaces, and the fields fail[ed] to drain properly under the synthetic turf."[76]

The plaintiff in the state court action had alleged that the construction company "was negligent in designing, manufacturing and installing a suitable and compatible subdrain system and impermeable liner" and, "[a]s a result, . . . there was damage to the synthetic turf, the impermeable liner, the subdrain system, and the subgrade."[77] The Third Circuit concluded that such conduct did "not support a determination that any damage was caused by an 'occurrence'" as "claims of damage [were] based on faulty workmanship. Because they are not caused by an accident, under *Kvaerner*, they are not a covered 'occurrence' under the insurance policy."[78]

Although one defendant argued that "damage to the subgrade, which was prepared by [a third-party construction company], was accidental, and thus constitute[d] a covered occurrence," the Third Circuit rejected that notion.[79] The court analyzed both *Kvaerner* and a Superior Court case, *Millers Capital Insurance Co. v. Gambone Bros. Development Co.*,[80] to determine that the defendant's argument "ignores that the *Gambone* Court, following *Kvaerner*, clearly focused on whether the alleged damage was caused by an accident or unexpected event, or was

---

[76] *Id.*
[77] *Id* at 238.
[78] *Id.*
[79] *Id.*
[80] 941 A.2d 706 (Pa. Super. Ct. 2007).

a foreseeable result of the faulty workmanship when deciding whether the policy covered the damage."[81] The Third Circuit then concluded that, although third-party property was damaged, "water damage to the subgrade [was] an entirely foreseeable, if not predictable, result of the failure to supply a 'suitable' impermeable liner or properly install the drainage system" and, thus, such "damage [was] not 'sufficiently fortuitous to constitute an 'occurrence' or 'accident.'"[82]

This analysis of the Supreme Court of Pennsylvania's decision in *Kvaerner* comports with this Court's reading of *Kvaerner*. In *Kvaerner*, the Supreme Court of Pennsylvania analyzed the meaning of the word "accident" as used in an insurance policy and noted that, since the word was not defined in that policy, the word must be "construed according to [its] natural, plain, and ordinary sense."[83] The court noted that dictionaries "define[] 'accident' as an unexpected and undesirable event, or something that occurs unexpectedly or unintentionally. The key term in the ordinary definition of 'accident' is 'unexpected.' This implies a degree of fortuity that is not present in a claim for faulty workmanship."[84]

With that definition in mind, the court concluded

that the definition of "accident" required to establish an "occurrence" under the policies cannot be satisfied by claims based upon faulty workmanship. Such claims simply do not present the degree of fortuity contemplated by the ordinary definition of "accident" or its common judicial construction in this context. To hold otherwise would be to

---

[81]   609 F.3d at 239.
[82]   *Id.* (quoting *Gambone*, 941 A.2d at 713).
[83]   *Kvaerner*, 908 A.2d at 897.
[84]   *Id.* at 897-98 (brackets and internal quotation marks omitted).

convert a policy for insurance into a performance bond. We are unwilling to do so, especially since such protections are already readily available for the protection of contractors.[85]

It is certainly true, as the Superior Court noted in its opinions, that the *Kvaerner* Court cited to several cases that distinguished between damage to third-party property and damage to the work product itself.[86] The *Kvaerner* Court also noted that "[t]he underlying suit in this case avers only property damage from poor workmanship to the work product itself."[87] Nevertheless, the court, in its core holding, did not differentiate between the type of property that was damaged. Rather, the court simply noted that the complaint "detail[ed] construction defects and a series of workmanship related irregularities. As faulty workmanship does not constitute an 'accident' as required to set forth an occurrence under the CGL policies, we hold that National Union had no duty to defend or indemnify Kvaerner in the action brought by Bethlehem."[88]

That holding was in no way dependent upon the fact that the underlying damage was to the insured's property. The court's concern was not primarily directed at the insured versus third-party-property dichotomy but, instead, was directed toward whether any damage was a natural consequence of faulty

---

85   *Id.* at 899.
86   *Id.* at 898-99 (citing *L–J, Inc. v. Bituminous Fire & Marine Ins. Co.,* 366 S.C. 117, 621 S.E.2d 33 (2005); *Snyder Heating v. Pennsylvania Mfrs. Ass'n Ins. Co.,* 715 A.2d 483 (Pa. Super. Ct. 1998); *McAllister v. Peerless Ins. Co.,* 124 N.H. 676, 474 A.2d 1033 (1984)).
87   *Id.* at 899.
88   *Id.* at 900.

workmanship, such that it cannot be considered "an unexpected and undesirable event, or something that occurs unexpectedly or unintentionally"[89] as the Third Circuit held in *Specialty Surfaces*.[90]

Using that test as a baseline, this matter falls squarely within the category of damages that are not covered by insurance contracts. The state court ordered reimbursement for damages caused by Masterforce's defective roof installation, which included leak repairs, a double charge for gutters, ridge vent replacement, replacement wood blocking due to water damage, and charges related to the installation of a replacement roof—including a roof consultation, roof demolition, and the replacement roof.[91]

Every cost but two may be termed damage to the product itself; the duplicative gutter charges and ridge vent replacement are direct results of Masterforce's improper installation and billing practices, and charges related to the replacement of the roof were necessitated because Masterforce installed a roof that was inappropriate for the Brandts' home and not up to code and which, in any event, was improperly installed that roof. These costs totaled $71,715.05 out of the $74,216.05 in damages awarded by the state court, excluding treble damages. Since these

---

[89]   *Id.* at 898 (brackets and internal quotation marks omitted).
[90]   609 F.3d at 239. The Court notes that at several other district courts have reached the same conclusion. *See Northridge Vill., LP v. Travelers Indem. Co. of Conn.*, No. CV 15-1947, 2017 WL 3776621, at *9 (E.D. Pa. Aug. 31, 2017) (collecting cases).
[91]   Doc. 1-3 at 13-15.

damages are to the product itself, they are undoubtedly excluded from coverage under *Kvaerner* and its progeny.

The remaining damages, totaling $2,501, are also covered as entirely expected damage to third-party property.[92] First, $481 in damage resulted when Masterforce improperly failed to cover the roof during installation, resulting in rain water leaking into the home causing damage.[93] Second, damages in the amount of $2,020 resulted from water leakage as a result of the improper roof installation; that water leak caused damage to the wood beneath the roof, which then needed to be replaced.[94] Similar to *Specialty Surfaces*, where the Third Circuit determined that "water damage to the subgrade is an entirely foreseeable, if not predictable, result of the failure to supply a 'suitable' impermeable liner or properly install the drainage system,"[95] here water leakage that damaged wood below the roof was an entirely foreseeable result of the failure to properly cover or install the roof.

The Court also concludes that Berkley is not required to indemnify Masterforce the treble damages awarded by the state court. The Superior Court of

---

[92] Even if the Court were wrong and the Supreme Court of Pennsylvania would require indemnification for damages to third-party property caused by faulty workmanship, here that would require Berkley to indemnify only $2,501 of the total damages awarded below.

[93] Doc. 1-3 at 7.

[94] *Id.* at 15; see Doc. 30-6 at 7-8.

[95] 609 F.3d at 239.

Pennsylvania has held in two thoughtful decisions that "[i]ntentional acts are not 'occurrences.'"[96] The Superior Court explained that

> the Pennsylvania Supreme Court in *Kvaerner* . . . has cautioned against . . . being overly inclusive in defining an "occurrence." It said that words should be used in their normal context, and be used in their natural, plain and normal sense. An occurrence has been defined by our Supreme Court as an "accident." An accident is a "something that occurs unexpectedly or unintentionally." The key term in the ordinary definition of "accident" is "unexpected." Thus, an occurrence is generally an unintended event. Viewing an occurrence this way makes sense in most circumstances and follows the idea that intentional acts are not occurrences.[97]

Here, not only did the state court determined that Wilton—Masterforce's subcontractor—"knowingly installed a roof system that was inappropriate for [the Brandts'] residence as it violated the Building Code and the Manufacturer's recommendations," but it also determined that Masterforce took other intentional acts that violated Pennsylvania law.[98] Specifically, the state court concluded that Masterforce had intentionally failed to disclose that it did not intend to install the roof itself, intentionally failed to disclose that it had hired a subcontractor to complete the work, and actively concealed the fact that it employed a subcontractor to install the roof.[99]

---

[96] *Sclabassi v. Nationwide Mut. Fire Ins. Co.*, 789 A.2d 699, 703 (Pa. Super. Ct. 2001) (citing *Builders, Inc. v. Pa. Mfrs' Assoc. Ins. Co.,* 517 A.2d 910 (Pa. 1986)).

[97] *Erie Ins. Exch. v. Maier*, 963 A.2d 907, 909 (Pa. Super. Ct. 2008) (internal citation omitted).

[98] Doc. 1-3 at 15-16.

[99] *Id.*

These actions formed the basis of the state court's award of treble damages in the underlying action.[100] Because treble damages were awarded as a result of Masterforce's intentional conduct, those damages cannot be considered an "occurrence" under the 2012 Policy, and Berkley therefore has no duty to indemnify Masterforce for those damages.[101]

Finally, Berkley is not required to indemnify Masterforce for attorneys' fees awarded in the underlying action. The 2012 Policy provides that Berkley "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."[102] As discussed above, none of the damages resulting from the underlying action constitute an occurrence that Berkley is legally obligated to pay. As a result, attorneys' fees arising from the underlying action did not arise as a result of "property damage" that was covered by the 2012 Policy, and Berkley is not required to indemnify Masterforce for those attorneys' fees.

### C.   Masterforce's Counterclaims

Lastly, the Court concludes that judgment on the pleadings is warranted in Berkley's favor as to Masterforce's counterclaims for declaratory judgment and insurance bad faith.[103] With regard to Masterforce's counterclaim for declaratory

---

[100]  *Id.* at 16-18.
[101]  *Sclabassi*, 789 A.2d at 703.
[102]  Doc. 1-1 at 30.
[103]  Doc. 7 at 12-16.

judgment holding that Berkley is obligated to indemnify Masterforce, for the reasons discussed above, Berkley has no duty to indemnify Masterforce for the damages awarded in the underlying action, and Masterforce's counterclaim for declaratory judgment must fail.

With respect to Masterforce's counterclaim for insurance bad faith, to warrant a finding of bad faith in the denial of insurance coverage, a "plaintiff must demonstrate, by clear and convincing evidence, (1) that the insurer did not have a reasonable basis for denying benefits under the policy and (2) that the insurer knew or recklessly disregarded its lack of a reasonable basis in denying the claim."[104] As discussed above, Berkley properly denied benefits under the 2012 Policy and, as such, it certainly had "a reasonable basis for denying benefits under the policy,"[105] meaning that Masterforce cannot demonstrate bad faith.

Moreover, even if this Court were incorrect in its decision that Berkley owes no duty to indemnify Masterforce, the duty to indemnify is, at the very least, debatable, in light of the differing conclusions reached by the Superior Court and the Third Circuit.[106] Given that the caselaw in this area does not establish a clear duty for Berkley to indemnify Masterforce, it cannot be said that Berkley had no

---

[104] *Rancosky v. Washington Nat'l Ins. Co.*, 170 A.3d 364, 377 (Pa. 2017).
[105] *Id.*
[106] *Compare Specialty Surfaces*, 609 F.3d at 237-39, *with Indalex*, 83 A.3d at 425-26.

reasonable basis to deny benefits.[107] Accordingly, Berkley is entitled to judgment on the pleadings with respect to both of Masterforce's counterclaims.

## III.    CONCLUSION

In accordance with the above discussion, Berkley's motion for judgment on the pleadings will be granted, and Defendants' motion for judgment on the pleadings will be denied.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
United States District Judge

---

[107] *Cf. Campbell v. Galloway*, 483 F.3d 258, 271 (4th Cir. 2007) (noting that, under the qualified immunity standard, a constitutional right is not clearly established when there are "conflicting decisions" in that area); *Soares v. State of Connecticut*, 8 F.3d 917, 922 (2d Cir. 1993) (finding no clearly established constitutional right "in light of the presently existing conflict of views").